# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTAH DIVISION OF CONSUMER PROTECTION,<br><br>Plaintiff,<br><br>v.<br><br>TROY STEVENS, an individual, and doing business as REAL ESTATE WORKSHOP, a Utah DBA;<br><br>CORY WADSWORTH, an individual, and partner in REAL ESTATE WORKSHOP;<br><br>MJ AUGIE BOVE, an individual, and partner in REAL ESTATE WORKSHOP;<br><br>PROSPERITY INTERNATIONAL LLC, a Utah limited liability company, formerly doing business as FLIP AND BUILD WEALTH, a Utah DBA, and formerly doing business as REAL ESTATE WORKSHOP;<br><br>OPUS MANAGEMENT GROUP, LLC, a Utah limited liability company;<br><br>MANTIS MANAGEMENT, INC, a Utah corporation;<br><br>SELECTIVE MARKETING COMPANY, a Utah corporation;<br><br>and<br><br>BO-ROC MANAGEMENT INC., an Alaska corporation,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>FOR PUBLICATION<br><br>Case No. 2:19-cv-00441-HCN<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

The Utah Division of Consumer Protection ("Utah" or "the State") has sued Defendants, alleging violations of federal and state laws governing telemarketing and other business activities. Defendants have moved to dismiss the suit, claiming, *inter alia*, that the State lacks standing to bring this suit as well as statutory authority to do so. For the following reasons, the court grants the motion to dismiss.

## I.

This case centers on a company known as Real Estate Workshop ("REW"). The State alleges that REW, under the guidance of Defendants Troy Stevens, Cody Wadsworth, and MJ Augie Bove, invites customers to free seminars, purportedly to learn how to invest in tax liens. Dkt. No. 1 ("Compl.") ¶¶ 34–50. The State alleges, however, that "the actual purpose of the event[s] is to entice customers to purchase additional training from REW." *Id.* ¶ 47. According to the State, customers who attend the free seminars are pressured to pay $597 (or a similar fee) to attend a three-day seminar, and customers who attend the three-day seminar are then pressured to pay up to $50,000 for additional training and mentorship. *Id.* ¶¶ 49–57. The State alleges that Defendants telephone customers who decline to purchase additional training at the seminars and pressure them to reconsider their decisions. *Id.* ¶¶ 62–64. In addition, the State alleges that Defendants seek to sell customers additional related services by telephone. *Id.* ¶ 64.

According to the State, many of the representations made by Defendants in the course of selling their services are fraudulent. The State alleges that Defendants represent that purchasers of their services "(1) are guaranteed to earn substantial income quickly and easily, (2) will learn the skills necessary to engage in tax lien and other real estate investment strategies, and (3) will have access to mentors to assist in their success." *See* Dkt. No. 27-3 at 4 (proposed findings of

fact and conclusions of law). The State alleges that these representations are "unsubstantiated and wholly or partially false." *Id.* The State also alleges that "[d]issatisfied purchasers cannot get their money back without withdrawing any complaints about Defendants." *Id.*

The State contends that Defendants have violated the Telemarketing Act, 15 U.S.C. § 6101 *et seq.*, as implemented by the Telemarketing Sales Rule, 16 C.F.R. § 310 *et seq. See* Compl. ¶¶ 149–62 (Count I). It also alleges violations of various Utah statutes. *See id.* ¶¶ 163–96 (Counts II–IV).

## II.

Motions to dismiss for lack of subject matter jurisdiction generally take one of two forms. *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). A "facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint," and in reviewing such a challenge, "a district court must accept the allegations in the complaint as true." *Id*. In a "factual attack," by contrast, a party "may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id*. at 1003. In reviewing such a challenge, the district court does not "presume the truthfulness of the complaint's factual allegation" but has "wide discretion" to consider "affidavits" and other evidentiary submissions "to resolve disputed jurisdictional facts." *Id*. In this case, the court considers the State's allegations, declarations submitted by both parties in connection with the various motions that have been filed in this case, and representations made by both parties in their briefing on these motions and at a hearing held on August 1, 2019. Ultimately, however, the jurisdictional facts are not in dispute; rather, the court's decision turns on its analysis of governing law.

**III.**

Defendants argue that the State lacks standing to assert a claim under the Telemarketing Act because its declarations fail to establish—and its complaint fails even to allege—that "any Utah resident was ever contacted, sold to, or harmed" by Defendants. Dkt. No. 31 at 2. Indeed, Defendants represent that REW does not have any past or current Utah customers, and the State does not dispute this representation. *See* Transcript of Hearing on Motion for Preliminary Injunction at 11, 62. The State argues, however, that it has quasi-sovereign interests in (1) "enforcing consumer protection laws, both to protect individual consumers and to protect an honest marketplace," (2) "protecting its business reputation," (3) "fostering an honest business climate," (4) promoting "its reputation for responding to out-of-state consumer complaints," and (5) "protecting the interests of Utah consumers who may purchase REW products and services" in the future. Dkt. No. 47 at 4–7. The State asserts that these interests "extend to all Utah residents"—both corporate and natural—that Defendants' conduct threatens or has harmed these interests, and that the threated or actual harm to these interests gives the State standing to assert a claim under the Telemarketing Act as *parens patriae* to its citizens. Dkt. No. 47 at 7–8. As explained below, the court finds that concrete injury to a State's citizens—whether actual or impending—is a prerequisite to *parens patriae* standing. Neither the parties nor the court have identified any case holding that a State has *parens patriae* standing to sue based on injuries to its citizens as abstract, generalized, and indirect as those asserted here. The court concludes that the State lacks standing to assert a claim under the Telemarketing Act.

Article III of the United States Constitution limits the judicial power to resolving "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Considering this limitation and "the separation-of-powers principles underlying [it]," the Supreme Court has "deduced a set of requirements that together make up the 'irreducible constitutional minimum of standing.'"

*Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

The plaintiff "carr[ies] the burden of establishing [its] standing under Article III" and "must demonstrate standing for each claim [it] seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 352 (2006). To prove standing for a particular claim, the plaintiff "must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (citing *Lujan*, 504 U.S. at 560–61).

As the State correctly notes, the Supreme Court has indicated that "'States are not normal litigants for the purpose of invoking federal jurisdiction' and are 'entitled to special solicitude in [the] standing analysis.'" Dkt. No. 47 at 2 (quoting *Massachusetts*, 549 U.S. at 518–20 (2007)). The Supreme Court, however, has not dispensed with the requirement that States satisfy the requirements of Article III. Rather, it has outlined three general ways in which a State may satisfy these requirements, two of which are not available to private litigants.

*First*, "like other associations and private parties, a State is bound to have a variety of proprietary interests." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982). "A State may, for example, own land or participate in a business venture." *Id*. When a State faces actual or threatened injury to its proprietary interests, it may establish standing in the same way as similarly situated private parties. *See id*. at 601–02. In *Massachusetts v. EPA*, for example, the Supreme Court emphasized the actual and threatened harm to state-owned coastal lands posed by rising sea levels, concluding that the State had "alleged a particularized injury in its capacity as a landowner." 549 U.S. at 522–23; *see also id*. (finding that "rising seas have already begun to

5

swallow Massachusetts' coastal land," of which the State "owns a substantial portion") (citations and quotation marks omitted).[1]

*Second*, in light of the States' role as separate sovereigns in our constitutional system, the Supreme Court has recognized States' standing to vindicate their sovereign interests. In *Snapp*, the Supreme Court recognized two such interests that may give a State standing in federal court. 458 U.S. at 601. First, a State has a sovereign interest in its "exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Id.* When, for example, a federal court holds that a state law is unconstitutional, a State has standing to appeal that holding to vindicate its interest as a sovereign lawmaker. *See, e.g.*, *Diamond v. Charles*, 476 U.S. 54, 62 (1986). Second, a State has a sovereign interest in its "recognition from other sovereigns—most frequently this involves the maintenance and recognition of borders." *Snapp*, 458 U.S. at 601. This interest frequently supports standing, especially in cases with the Supreme Court's original jurisdiction. *See id*.

*Third*, the Supreme Court has held that a State may establish standing when its citizens have suffered injury and that injury—either because of its nature or its extent—implicates a state interest that is more than just the sum of the private injuries suffered by its citizens. *See Snapp*, 458 U.S. at 600–608. This type of standing is known as "*parens patriae* standing," and the requisite special interest of the State is known as a "quasi-sovereign" interest. *Id.* at 600–01. As

---

[1] At the outset of its standing analysis, the *Massachusetts* Court used the phrase "quasi-sovereign interest" and discussed the *parens patriae* doctrine. *See* 549 U.S. at 518–20 & n.17. Some courts have accordingly wondered whether it should be understood as a *parens patriae* case. *See Connecticut v. American Electric Power Company Inc.*, 582 F.3d 309, 336–39 (2nd Cir. 2009), *rev'd on other grounds*, 564 U.S. 41 (2011). But based on the Supreme Court's actual standing analysis, discussed above, this court agrees with the D.C. Circuit's recent holding that *Massachusetts* was not a *parens patriae* case and did not alter long-standing *parens patriae* doctrine. *See Manitoba v. Bernhardt*, 923 F.3d 173, 181–83 (D.C. Cir. 2019).

the Tenth Circuit has elaborated, "*[p]arens patriae* standing has been explained on the ground that the plaintiff state is not merely advancing the rights of individual injured citizens, but has an additional sovereign or quasi-sovereign interest." *Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464, 1469 (10th Cir. 1993) (quoting 17 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 4047 at 223 (1988)); *accord Snapp*, 458 U.S. at 607 ("In order to maintain [a *parens patriae*] action, the State must articulate an interest apart from the interests of particular private parties . . . . The State must express a quasi-sovereign interest.").

As the modifier "quasi" suggests, quasi-sovereign interests are somewhat akin to sovereign interests. But quasi-sovereign interests "are not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party." *Snapp*, 458 U.S. at 602. Rather, quasi-sovereign interests are the "set of interests that the State has in the well-being of its populace." *Id.* Although "neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract," the Supreme Court has recognized two "general categories" of quasi-sovereign interests: a State's interest in "the health and well-being—both physical and economic—of its residents in general" and its interest "in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607.

In this case, the State cannot establish injury to any proprietary interests—it does not allege that it has purchased any services from Defendants or that they have somehow harmed state property. And although the State's sovereign interest in enforcing its own laws may give it standing to assert its state law claims, the sovereign interest in enforcing the Telemarketing Act belongs to the United States, not Utah. Accordingly, the State may assert its federal claim only if

7

it can establish *parens patriae* standing. *See DaimlerChrysler Corp.*, 547 U.S. at 352 (Plaintiff "must demonstrate standing for each claim [it] seeks to press.").

Both Defendants and the State seek to distill requirements for *parens patriae* standing from the Supreme Court's discussion of the *parens patriae* doctrine and quasi-sovereign interests in *Snapp*. *Compare* Dkt. No. 31 at 8–9, *with* Dkt. No. 47 at 2–3. The court need not determine which party's formulation of the *Snapp* requirements is correct or whether the State has satisfied these requirements in this case, however. For after reviewing *Snapp*, other Supreme Court and Tenth Circuit *parens patriae* decisions, and the decisions cited the parties, the court agrees with the Ninth Circuit that "before proving that [it can] satisfy [the *Snapp*] requirements," a sovereign "must allege injury in fact to the citizens [it] purport[s] to represent as *parens patriae*." *Table Bluff Reservation v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001). And the court finds that the State has failed to establish this prerequisite to *parens patriae* standing in this case.

The Supreme Court's decision in *Snapp* focuses on the test for determining whether a State has asserted "a quasi-sovereign interest" "apart from the interests of particular private parties." 458 U.S. at 607. But there was no dispute in that case that Puerto Rico had alleged concrete injury to its citizens. *See id.* at 608 ("The complaint presents two fundamental contentions. First, it alleges that the petitioners discriminated against Puerto Ricans in favor of foreign laborers. Second, it alleges that Puerto Ricans were denied the benefits of access to domestic work opportunities that [federal statutes] were designed to secure for United States workers."); *id.* at 597 (Puerto Rico alleged concrete injury to 787 of its citizens). And the Court's *parens patriae* discussion plainly presupposes actual or threatened injury to the sovereign's citizens. *See, e.g.*, *id.* at 607 ("Although more must be alleged than *injury to an identifiable group of individual residents*, the indirect effects of the injury must be considered as well in

determining whether the State has alleged *injury to a sufficiently substantial segment of its population*.") (emphases added); *id.* ("One helpful indication in determining whether *an alleged injury to the health and welfare of its citizens* suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.") (emphasis added). And as a matter of logic, it is clear enough that the mere assertion of a state interest, untethered from injury to the State's citizens, cannot support *parens patriae* standing—even if that interest might qualify as a quasi-sovereign interest if accompanied by such injury. For example, although Utah no doubt has an interest in preventing fraud, this interest would not give Utah standing to enforce a federal statute against a Californian citizen who defrauded only consumers in Arizona. And this is so even though a State's interest in combating fraud has been recognized as a quasi-sovereign interest in other contexts. *See, e.g.*, *New York v. General Motors Corporation*, 547 F. Supp. 703, 704–06 (S.D.N.Y. 1982) (*parens patriae* case brought by New York to redress injuries suffered by consumers in New York as well as other States); *Kelley v. Carr*, 442 F. Supp. 346, 352, 356–57 (W.D. Mich. 1977) (*parens patriae* brought by Michigan and to redress injuries suffered by consumers in Michigan as well as in other States), *aff'd in part and rev'd in part on other grounds*, 691 F.2d 800 (6th Cir. 1980).

Other cases confirm that the citizens of the State asserting *parens patriae* standing must have suffered—or be threatened with—concrete injury. *See Satsky*, 7 F.3d at 1469 ("*Parens patriae* standing has been explained on the ground that the plaintiff state is *not merely advancing the rights of individual injured citizens*, but has an additional sovereign or quasi-sovereign interest.") (internal quotation marks and citation omitted; emphasis added); *In re Electronic Books Antitrust Litigation*, 14 F. Supp. 3d 525, 531 (S.D.N.Y. 2014) (States suing as *parens*

9

*patriae* alleged "their own *and their citizens' concrete injury*" due to the defendant's alleged wrongdoing) (emphasis added); *New York v. Microsoft*, 209 F. Supp. 2d 132, 151 (D.D.C. 2002) (noting that "[w]hile certainly a state alleging injury *must establish that its own citizens have suffered some injury*, none of the cases cited by Microsoft hold that *parens patriae* standing should be denied where the injury is felt by the citizens of the other states") (emphasis added). Notably, in each case discussed by the *Snapp* Court, as in *Snapp* itself, the citizens of the States asserting *parens patriae* standing faced actual or threatened concrete injury. *See Snapp*, 458 U.S. at 601–09. Indeed, in each of these cases the States' quasi-sovereign interests were implicated because of the nature or extent of the actual or threatened injury to their citizens. The court does not doubt that "*parens patriae* interests extend well beyond the prevention of . . . traditional public nuisances," such as in the cases cited by the *Snapp* Court, 458 U.S. at 605—indeed *Snapp* itself is one such case. But the court has no reason to believe that a State's ability to act as *parens patriae* extends to cases in which its citizens have not suffered concrete injury. The parties have not cited, and this court has not found, any case finding *parens patriae* standing absent such injury. Nor is this lack of precedent surprising—a State is, after all, the "parent" of its own citizens, not those of other States. *See Snapp*, 458 U.S. at 600 ("*Parens patriae* means literally 'parent of the country.'") (citation omitted).

To be sure, in *Connecticut v. American Electric Power Company Inc.*, the Second Circuit held that a State need not establish that its citizens satisfy Article III's core requirements in order to assert *parens patriae* standing. *See* 582 F.3d 309, 338–39 (2nd Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011). But the States in that case had alleged harm from climate change to "their environments, *residents*, and property." *Id*. at 317 (emphasis added). Further, the Second Circuit expressly acknowledged that under the *parens patriae* doctrine, a State sues "on

10

behalf of *its injured citizens*." *Id*. at 335 (emphasis added). Thus, even assuming that its holding is correct (*but see Table Bluff Reservation*, 256 F.3d at 885), the Second Circuit's decision does not dispense with the requirement that a State seeking to sue as *parens patriae* must allege concrete injury to its citizens.

Indeed, what seems to have driven the Second Circuit's holding in *American Electric* was the need to reconcile a different requirement of Article III standing—redressability—with Second Circuit precedent. In the Second Circuit, a State asserting *parens patriae* standing must not only satisfy the requirements set forth in *Snapp* but must also show that the citizens whose injury the State seeks to redress "could not obtain complete relief through a private suit." *American Electric*, 582 F.3d at 336 (citation omitted). Requiring a State to show not only that its citizens had suffered injury in fact, but also that this injury could be redressed by a favorable judicial decision on their behalf, would be in significant tension with the requirement that the State show its citizens could not obtain relief through a private suit.[2]

In this case, the State lacks standing to maintain its claim under the Telemarketing Act because it has not alleged any concrete injury to its citizens. The court does not doubt Utah's interests in enforcing consumer protection laws, protecting its business reputation, fostering an honest business climate, responding to out-of-state consumer complaints. Nor does the court question the other general interests the State seeks to vindicate in this suit.[3] And if these interests

---

[2] As noted above, *see supra* n.1, this Court does not understand *Massachusetts v. EPA* as a *parens patriae* case, nor does it believe that case altered the requirements for *parens patriae* standing. Even if *Massachusetts* were a *parens patriae* case, moreover, the Court in that case did not call into question the requirement that a State's citizens must suffer concrete injury in a *parens patriae* case. Indeed it had no need to do so: Massachusetts alleged injury to its citizens, including an increased risk of disease. *Massachusetts*, 549 U.S. at 521.

[3] The State also seeks to protect the interests of Utah consumers who may purchase REW products and services in the future. Given that the State neither alleges that any Utah consumers have purchased products or services from REW nor disputes Defendants' representation that it

11

were accompanied by concrete injury to Utah citizens, they might well support *parens patriae* standing. But in the case, such injury is lacking. To be sure, the State asserts that its citizens share the general interests it has identified and that because Defendants' conduct contravenes these interests it harms not only Utah, but its citizens as well. But this sort of abstract, generalized, and derivative harm is a far cry from the "concrete and particularized" injury in fact required by Article III. *Lujan*, 504 U.S. at 560; *see also Table Bluff Reservation*, 256 F.3d at 885 (Sovereign "must allege injury in fact to the citizens [it] purport[s] to represent as *parens patriae*."). The parties have not cited, and this court has not identified, any decision upholding *parens patriae* standing based on injury to a State's citizens as indirect and amorphous as that asserted here. The court accordingly holds that the State has failed to allege injury to its citizens that is sufficiently concrete to give it standing to sue on their behalf as *parens patriae*. The State's claim under the Telemarketing Act must therefore be dismissed for lack of jurisdiction.

## IV.

Even if the State were not required to allege concrete injury to Utah citizens to establish Article III standing under the *parens patriae* doctrine, this court would still grant the motion to dismiss the State's federal claim, for it concludes that the State is required to allege such injury in order to bring a claim under the Telemarketing Act.[4]

---

has no past or current Utah customers, the court finds this threat of injury to Utah citizens too speculative and remote to support *parens patriae* standing. *See Morgan v. McCotter*, 365 F.3d 882, 888 (10th Cir. 2004) (A "main focus of the standing inquiry is whether [the] plaintiff has suffered a present or imminent injury, as opposed to a mere possibility, or even probability, of future injury.").

[4] Defendants style their argument that the Telemarketing Act requires such an allegation as a standing argument and seek dismissal on this ground under Federal Rule of Civil Procedure 12(b)(1). *See* Dkt. No. 31 at 5–12. Defendants' argument, however, goes to "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark International*, 572 U.S. at 127. And the Supreme Court has made clear that such arguments are not jurisdictional. *See id*. at 128, n.4. Especially given that Defendants have filed motions to

The State brings suit pursuant to the following provisions of the Telemarketing Act:

(a) In general

Whenever an attorney general of any State has reason to believe *that the interests of the residents of that State have been or are being threatened or adversely affected* because any person has engaged or is engaging in a pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of this title, the State, *as parens patriae*, may bring a civil action *on behalf of its residents* in an appropriate district court of the United States to enjoin such telemarketing, to enforce compliance with such rule of the Commission, to obtain damages, restitution, or other compensation *on behalf of residents of such State*, or to obtain such further and other relief as the court may deem appropriate.
…

(f) Actions by other State officials
…

(2) In addition to actions brought by an attorney general of a State under subsection (a), such an action may be brought by officers of such State who are authorized by the State to bring actions in such State *on behalf of its residents*.

15 U.S.C. § 6103 (emphases added).

Section 6103's authorization of States to sue as "*parens patriae*" strongly suggests that they must sue on behalf of their injured citizens, for "it is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken . . . ." *F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012) (internal quotation marks and citations omitted). And as discussed above, *parens patriae* suits have traditionally been brought to vindicate quasi-

---

dismiss under both Rule 12(b)(1) and Rule 12(b)(6), however, the court disregards the label Defendants have attached to this argument and evaluates it under the latter provision. In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a district court accepts the factual allegations in the complaint as true, views those allegations in the light most favorable to the nonmoving party, and denies the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (internal quotation marks and citation omitted).

sovereign interests arising from concrete injuries to a sovereign's citizens and, indeed, neither the parties nor the court has identified any case upholding *parens patriae* standing absent such injury.

Section 6103 further requires that the State have "reason to believe that the interests of the residents of *that* State have been or are being threatened or adversely affected," repeatedly authorizes it to bring suit "on behalf of *its* residents," and permits it to "obtain damages, restitution, or other compensation on behalf of residents of *such* State." (Emphases added.) The statute's clear and repeated focus on the residents of the State bringing suit is fully consistent with its invocation of the *parens patriae* doctrine and confirms that Congress intended to authorize States to sue *only* on behalf of their injured citizens. For "a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

This conclusion is reinforced by the provision of the Telemarketing Act authorizing federal suits to enforce the Act and its implementing regulations:

(b) Actions by Commission

The Commission shall *prevent any person from violating a rule of the Commission under section 6102* of this title in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this chapter. *Any person who violates such rule* shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act in the same manner, by the same means, and with the same jurisdiction, power, and duties as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated into and made a part of this chapter.

. . .

(d) Enforcement by Bureau of Consumer Financial Protection

> [T]his chapter shall be enforced by the Bureau of Consumer Financial Protection under subtitle E of the Consumer Financial Protection Act of 2010, *with respect to the offering or provision of a consumer financial product or service* subject to that Act.

15 U.S.C. § 6105 (emphases added). In sharp contrast to Section 6103, Section 6105 focuses not on consumers who are victims of violations of the Telemarketing Act and its implementing regulations but rather on the telemarketers who perpetrate those violations. And wholly absent from Section 6105 are all of the indicators discussed above that limit the scope of state enforcement authority. There is no requirement that the FTC or the CFPB sue on behalf of residents or consumers, no language indicating that these agencies sue "*parens patriae*," and no mandate that they have "reason to believe that the interests of the residents of [the United States] have been or are being threatened or adversely affected" before bringing suit.

Congress could have similarly focused Section 6103 on violators rather than victims, and it could have given States broad enforcement authority akin to that of the FTC and the CFPB—for example by authorizing a State to sue whenever its Attorney General had reason to believe that its residents were violating the Telemarketing Sales Rule—but it clearly did not. This court will not read Section 6103 as if it were drafted in the same fashion as Section 6105, for there is a strong presumption that "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015).

Because the State has failed to allege that any of its residents has ever been or is even likely to become a victim of the violations it challenges, this court would dismiss the State's federal claim for failing to comply with Section 6103's requirements even if dismissal were not required for lack of standing.

15

# V.

In addition to its federal claim (Count I), the State asserts claims under Utah state law (Counts II–IV). "The federal courts of appeals, however, have uniformly held that once the district court determines that subject matter jurisdiction over a plaintiff's federal claims does not exist, courts must dismiss a plaintiff's state law claims." *Scarfo v. Ginsberg*, 175 F.3d 957, 962 (11th Cir. 1999). "In other words, if there be no federal subject matter jurisdiction, it follows that there is nothing to which to append state claims[.]" *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1168 (10th Cir. 2004). Even if this court had discretion to entertain the state law claims, moreover, it would decline to do so: this case is not yet two months old, no discovery has been completed, and state courts are the ideal forum to adjudicate state law claims brought by a State against its citizens. *See* 28 U.S.C. § 1367(c)(3). The court accordingly dismisses Counts II–IV.

\* \* \*

Today's holding turns on the limited nature of the federal courts' jurisdiction and the specific contours of the *parens patriae* doctrine. A State may establish standing under this doctrine only if its citizens have suffered—or are threatened with—concrete injury. But in this case the State has failed to allege any concrete injury to any of its citizens. It thus lacks standing to maintain its claim under the Telemarketing Act.

The court does not question the State's sovereign interest in enacting laws regulating individuals and entities doing business from Utah—regardless of where their customers are located—as well as its sovereign interest in enforcing such laws. *See, e.g.*, *iMergent, Inc. v. Giani*, 2007 WL 895128, \*5 (D. Utah March 21, 2007) (noting "the 'longstanding prevalence of state regulation' in the corporate area") (citation omitted). Indeed, this court has previously

recognized Utah's interest in (1) "protecting consumers against the harms of unchecked, exploitative businesses that are centered in Utah" and (2) "preventing Utah from obtaining a reputation as being a haven for such businesses." *Id.* Utah has enacted state laws governing such individuals and entities, and it is free to revise those laws or to enact additional laws if the existing laws are inadequate. But absent proper grounds for invoking federal jurisdiction, the appropriate forum for such enforcement actions is in the State's own judicial or administrative tribunals.

For the foregoing reasons, the court GRANTS Defendants' motion to dismiss. IT IS SO ORDERED.

DATED this 19th day of August, 2019.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge